# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DEEPA SONI, M.D.,**       : | |
| 636 Beacon Street, #604       : | |
| Boston, MA 02215       : | |
|       : | |
|     **Plaintiff**       : | |
|       : | Civil Action No.: |
| v.       : | |
|       : | |
| **BOSTON MEDICAL CENTER**       : | |
| **CORPORATION**       : | |
| One Boston Medical Center Place       : | |
| Boston, MA 02118       : | |
|       : | |
| **BOSTON UNIVERSITY**       : | |
| **NEUROSURGICAL ASSOCIATES, INC.**: | |
| 88 East Newton Street       : | |
| Boston, MA 02118       : | |
|       : | |
| **BOSTON UNIVERSITY**       : | |
| **d/b/a BOSTON UNIVERSITY SCHOOL** : | |
|   **OF MEDICINE**       : | |
| One Silber Way       : | |
| Boston, MA 02215       : | |
|       : | |
| **LARRY CHIN, M.D.**       : | |
| One Boston Medical Center Place       : | |
| Boston, MA 02118       : | |
|       : | |
| **ARTHUR DAY, M.D.**       : | |
| 75 Francis Street       : | |
| Boston, MA 02115       : | |
|       : | |
|     **Defendants.**       : | |

## COMPLAINT

This is an action to recover damages on behalf of the Plaintiff Deepa Soni, M.D. (hereinafter "Dr. Soni"), by and through her legal counsel Elise A. Brassil of the Law Offices of Elise A. Brassil, 300 Brickstone Square, Suite 201, Andover, MA 01810.  This action arises out of retaliation pertaining to false claims presented by Defendants under the Medicare Program, Medicaid Program and other Federal Health Care Programs.  This civil action is also brought by Dr. Soni on her own behalf against Defendants Boston Medical Center (hereinafter "BMC"), Boston University Neurosurgical Associates, Inc. (hereinafter "BUNA"), Boston University, doing business as Boston University School of Medicine (hereinafter "BU" and/or "BUSM"), and Larry Chin, M.D. (hereinafter "Dr. Chin") for violation of 31 U.S.C. §3730(h).  These Defendants retaliated against Dr. Soni because of complaints and concerns raised by Dr. Soni to Defendants regarding their repeated and continual failure to comply with minimal medical standards of care and their repeated and continual fraudulent billings to the Federal Health Care Programs.

The acts of Defendants in retaliating against Dr. Soni, including but not limited to the wrongful discharge, loss of privileges, loss of Assistant Professor status, loss of teaching functions, loss of medical staff privileges, harassment, refusal to acknowledge her accomplishments to other healthcare entities and other discrimination against and of Dr. Soni by Defendants, violates the provisions of 31 U.S.C. §3730(h) which prohibit discrimination by employers against employees who investigate and/or report violations.  As a direct and proximate result of the foregoing, Dr. Soni has lost all of the benefits and privileges of employment. Consequently, Dr. Soni is entitled to all relief necessary to make her whole.

2

Dr. Soni also brings this action against Defendants BMC, BUNA, BU, Dr. Chin and Arthur Day, M.D. (hereinafter "Dr. Day") for violations of 42 U.S.C. §1981 (which guarantees that all persons shall have the same contractual rights as are enjoyed by white citizens), and Dr. Soni brings this action based on these Defendants' violations of 42 U.S.C. §2000e *et seq.* (which makes it unlawful for an employer to discriminate against an individual based on such individual's race, color, religion, sex, or national origin). In addition, Dr. Soni brings this action against Defendants for numerous violations under Massachusetts state law.

## JURISDICTION AND VENUE

1. This action arises under the provisions of 31 U.S.C. §§ 3729 *et seq.*, commonly called the False Claims Act ("FCA"). The FCA provides, among other things, that the United States District Courts have exclusive subject matter jurisdiction over actions brought under it.

2. Under 31 U.S.C. §3730(h), "Any employee who is discharged . . . or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section . . . shall be entitled to all relief necessary to make the employee whole."

3. Plaintiff Dr. Soni resides in this District.

4. One or more Defendants reside and transact business in this District, and one or more acts complained of herein occurred in this District.

5. Under 31 U.S.C. §3732(a), "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729

occurred." Under 31 U.S.C. §3730(h), an employee may bring an action for relief under that subsection in the appropriate United States District Court. Consequently, jurisdiction and venue are proper in the United States District Court for the District of Massachusetts.

6.   Plaintiff Dr. Soni's action seeks to remedy Defendants' wrongful conduct through the following claims for relief under federal and state law: a) Violations of the Federal Whistle-Blowers Protection Act codified at 31 U.S.C. §3730(h); b) Violations of 42 U.S.C. §1981; c) Violations of 42 U.S.C. §2000e *et seq.* occurring at BMC and stemming from retaliation by Dr. Day and conspiracy to violate same; and various claims under Massachusetts state law, all as more fully set forth below.

7.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 since these claims arise from violations of laws of the United States and related state statutes.

8.   This Court has supplemental jurisdiction over Dr. Soni's state law claims pursuant to 28 U.S.C. §1367.

9.   Venue is proper in this Court as all parties are either Massachusetts citizens or Massachusetts corporations and/or corporations doing business in Massachusetts and found in Massachusetts, and the conduct complained of took place in Massachusetts.

## PARTIES TO THE ACTION

10.   Plaintiff Dr. Soni is a United States citizen and a female medical doctor whose descent is sub-continent Indian (hereinafter "Indian") race and national origin. She is licensed to practice medicine in the Commonwealth of Massachusetts, and she resides in Boston, Massachusetts.

4

11.   After completion of her Neurosurgical Residency training, Plaintiff Dr. Soni became an employee of Defendant BUNA in July 2007.

12.   As part of her duties as an employee of Defendant BUNA, Plaintiff Dr. Soni provided medical care, including performing Neurosurgical procedures to patients at the hospital owned and operated by Defendant BMC.  Plaintiff Dr. Soni served Defendant BMC as an attending physician and Neurosurgeon with hospital staff privileges, and as an Assistant Professor at BUSM.

13.   Defendant BUNA is a non-profit corporation, duly organized and existing under the laws of the Commonwealth of Massachusetts, with a usual place of business in Boston, Massachusetts.

14.   Defendant BMC is a non-profit corporation, duly organized under the laws of the Commonwealth of Massachusetts, with a usual place of business in Boston, Massachusetts.

15.   Defendants BUNA and BMC provide and have provided medical services to patients and receive and have received payment for those services through private pay and public methods, including but not limited to payments from Medicare, Medicaid, and the other Federal Health Care Programs and are employers under 42 U.S.C. §2000e *et seq*.

16.   Defendant BU is a major academic university located in Boston, Massachusetts. According to BU's website, it offers over 250 undergraduate, graduate, doctoral, and special degree programs in nineteen (19) separate schools and colleges, and it is an employer under 42 U.S.C. §2000e *et seq*.

17. BUSM offers a number of unique pathways for students to earn degrees as Medical Doctors. The BU website also notes that BUSM is located at 715 Albany Street, Boston, Massachusetts 02118.

18. BUSM provides training to medical students in both ambulatory and in-patient care at its primary teaching hospital BMC.

19. After completion of her Neurosurgical Residency training, Plaintiff Dr. Soni was employed as an Attending Neurosurgeon at BMC in July 2007 and as an Assistant Professor of Medicine at BUSM in September 2007. The acts and omissions complained of herein have occurred from July 2007 to the present.

20. Defendant Dr. Chin is a medical doctor who serves as the Chairman of the Neurosurgery Departments at Defendant BMC and BUSM and who was Plaintiff Dr. Soni's direct supervisor during the period of her employment at BMC, located in Boston, Massachusetts.

21. Defendant Dr. Chin, in concert with the other Defendants, perpetrated the discriminatory and retaliatory acts against Dr. Soni, as described herein, based in part upon racial, sexual and national origins animus.

22. Defendant Dr. Day is a medical doctor who serves as the Chairman of the Neurosurgery Department for Brigham & Women's Hospital and for Harvard Medical School, and he serves as the Neurosurgery Residency Program Director for Brigham & Women's Hospital and Children's Hospital (hereinafter collectively referred to as "BWH"). Dr. Day was Plaintiff Dr. Soni's supervisor during her Neurosurgery Residency training at BWH, located in Boston, Massachusetts.

6

23.   Defendant Dr. Day, in concert with the other Defendants, perpetrated the discriminatory and retaliatory acts against Dr. Soni, as described herein, based in part upon racial, sexual and national origins animus.

24.   Defendant BMC employed Elaine Ullian who serves as BMC's President and Chief Executive Officer.  Upon information and belief, as an agent of Defendant BMC, Ms. Ullian participated in the discriminatory and retaliatory conduct perpetrated against Plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

25.   Defendant BU employed Dr. Karen Antman as the Dean of the BUSM.  Upon information and belief, as an agent of Defendant BU, Dr. Antman participated in the discriminatory and retaliatory conduct perpetrated against Plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

26.   Defendant BMC employed Vincent Falco, who works as the administrator for the medical center's Department of Neurosurgery.  Upon information and belief, as an agent of Defendant BMC, Mr. Falco participated in the discriminatory and retaliatory conduct perpetrated against plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

27.   Defendant BMC employed Thai Vu, who worked as a Physicians Assistant (hereinafter "P.A.") in the medical center's Department of Neurosurgery.  Upon information and belief, as an agent of Defendant BMC, Mr. Vu participated in the discriminatory and retaliatory conduct perpetrated against plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

7

28.   Defendant BMC employed John DeJesus, who works as a P.A. in the medical center's Department of Neurosurgery.  Upon information and belief, as an agent of Defendant BMC, Mr. DeJesus participated in the discriminatory and retaliatory conduct perpetrated against plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

29.   Defendant BMC employed Suresh Agarwal who works as a general surgeon in BMC's Department of General Surgery.  Upon information and belief, as an agent of Defendant BMC, Dr. Agarwal participated in the discriminatory and retaliatory conduct perpetrated against plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

30.   Defendant BMC employed Dr. Peter Burke who works as a general surgeon in BMC's Department of General Surgery.  Upon information and belief, as an agent of Defendant BMC, Dr. Burke participated in the discriminatory and retaliatory conduct perpetrated against plaintiff Dr. Soni and/or approved, ratified, caused, and endorsed said unlawful conduct.

31.   Defendant BMC employed Ms. Stephanie Lovell who serves as the general counsel and head of risk management for the medical center.

### FACTUAL BACKGROUND

32.   Dr. Deepa Soni, is a 37-year-old female neurosurgeon of Indian descent. She is an American citizen, as are her parents. She was born in Michigan and raised in the Midwest.

33.   As a child, Dr. Soni dreamed of becoming a doctor, and knew from a very early age that she wanted to become a neurosurgeon.

34.   Throughout her educational process, Dr. Soni obtained the highest of academic honors. Upon graduating from medical school, Dr. Soni completed a 7-year Neurosurgery Residency Training program at Brigham & Women's Hospital, Harvard Medical School, and

Children's Hospital (hereinafter collectively referred to as "BWH "). Both Brigham & Women's Hospital and Children's Hospital are Harvard-affiliated Teaching Hospitals, and are among the top-rated institutions in the world.

35.   Dr. Soni completed the Neurosurgery residency program on June 30, 2006, and was the second woman ever to complete the BWH Neurosurgery Residency Program, in its entirety, in more than 70 years of the programs existence.

36.   Dr. Soni also completed an additional one year of specialized fellowship training in cerebrovascular Neurosurgery, in June 2007. Dr. Soni's fellowship was funded by BWH.

37.   Upon completion of her fellowship, Dr. Soni began working as an attending Neurosurgeon in July 2007, and was employed by BUNA. BUNA is a faculty practice corporation for the Department of Neurosurgery at BMC and has an academic affiliation with BUSM.

38.   BUNA is organized and operated for the benefit of BMC and BUSM.

39.   Dr. Soni, as part of her employment with BUNA, had appointments as an Assistant Professor at BUSM and as a staff Neurosurgeon at BMC.

40.   Dr. Soni is the first female Neurosurgeon ever to be employed by BUNA and BMC, and she is the first female Neurosurgery faculty member at BUSM in the history of the institution. She is also the first Neurosurgeon of Indian heritage at BMC and BUSM.

41.   While employed at BUNA and BMC, Dr. Soni's immediate supervisor was Dr. Chin.

9

## OVERVIEW OF NEUROSURGERY TRAINING IN THE UNITED STATES

42.   There are currently 97 accredited Neurosurgery training programs in the United States with approximately 1300 Neurosurgical residents in these programs.

43.   Most of the Neurosurgery residency training programs, such as the program completed by Dr. Soni at BWH are intensive and last for seven (7) years.   In 2004, the Accreditation Council for Graduate Medical Education (hereinafter "ACGME") mandated that all U.S. medical residents be limited to working a maximum of 80 to 88 hours per week – down from typical average work weeks of 100 hours.

## WOMEN AND GENDER DISCRIMINATION IN NEUROSURGERY

44.   The community of Neurosurgeons throughout the United States is very small.   There are approximately 4,500 Neurosurgeons in the United States and approximately four percent (4%) of those Neurosurgeons are women.

45.   The occurrence of gender discrimination in Neurosurgery is well documented. Gender discrimination in Neurosurgery is very prevalent and widely recognized.

46.   Many female Neurosurgeons have been subjected to discrimination in the workplace.

## THE NEUROSURGERY JOB MARKET

47.   The field of Neurosurgery is very specialized and very small.   Recruiting in the academic and private sector of the Neurosurgery environment is a competitive and rigorous process.

48.   The Neurosurgery community across the United States has fewer than 3,500 Board-Certified Neurosurgeons in practice, with approximately 400 academic Neurosurgeons.   The

10

Neurosurgery community is small, private, and guarded, and communication between and among

Neurosurgeons is pervasive.

49.   Before a Neurosurgeon is hired by a hospital, the Neurosurgery Department

Chairman will usually telephone his medical colleagues and Residency Program Directors across

the country to obtain references and/or evaluations of the candidate.

50.   Due to the small size of the Neurosurgery community, Neurosurgeons often rely on

"word-of-mouth" (rather than written) references.

51.   Before a Neurosurgeon can begin to practice at a particular hospital, he/she must be

licensed to practice medicine in that state and be credentialed to perform surgery at that hospital.

The licensing and credentialing process is lengthy and can frequently take up to 9-12 months.

52.   It typically takes a significant amount of time to build a Neurosurgery practice, and it

often takes years for a Neurosurgeon to become established in a community.  As a result,

Neurosurgeons generally do not move or change jobs during the course of their careers.

### DR. SONI'S RESIDENCY TRAINING AND DISCRIMINATION AT BWH

53.   The Neurosurgery training program at BWH is a seven-year residency program

following graduation from medical school.  This is sometimes followed by an optional eighth

post-graduate year (hereinafter "PGY").

54.   During Dr. Soni's eight years of post-graduate training in Neurosurgery, she was paid

by Brigham & Women's Hospital, Inc. (for PGY1 and PGY8) and by Children's Hospital, Corp.

(for PGY2 - PGY7).

55.   There are usually fourteen (14) Neurosurgery residents in the BWH program at one time.  When Dr. Soni entered the Neurosurgery residency program there were two other female residents in the program.  These female residents were Dr. Claudia Martin and Dr. Malini Narayanan.  Dr. Narayanan was one year senior to Dr. Soni in the program, and like Dr. Soni, Dr. Narayanan is of Indian descent.

56.   When Dr. Soni entered the BWH residency program in 2000, Peter Black, M.D. (hereinafter "Dr. Black") was the Chairman of the Neurosurgery Departments at Brigham & Women's Hospital and at Children's Hospital.  Dr. Black remained in that position throughout Dr. Soni's residency.

57.   During Dr. Soni's first few years of residency training, Dr. Black also served as the Program Director of the BWH Neurosurgery residency program.

58.   Starting in 2000, Mark Proctor, M.D. (hereinafter "Dr. Proctor") became the Assistant Residency Program Director of the BWH Neurosurgery residency program.

59.   Dr. Day was hired to work as a Neurosurgeon at BWH in 2002, and he became the Program Director of the BWH Neurosurgery residency program towards the end of Dr. Soni's PGY3.

60.   Dr. Day was also appointed to the position of Vice-Chairman for the BWH Department of Neurosurgery and as Chief of the Cerebrovascular Service, a sub-specialty of Neurosurgery and an area of particular interest to Dr. Soni.

61.   Dr. Day is an extremely powerful man in the field of Neurosurgery, and he currently has or has had leadership positions in many of the organizations which support and represent

12

Neurosurgeons. Currently, Dr. Day serves as the co-chairman of the ACGME Neurosurgery

Residency Review Committee, the national organization that accredits new and existing

Neurosurgery residency training programs.

62. Upon information and belief, a letter documenting Dr. Day's long history of sexist

and discriminatory behaviour was sent in 2007 to Dr. Black and other members of the BWH

community. The letter was sent to protest the prospect of Dr. Day's candidacy for the

Chairmanship of the Neurosurgery Department at BWH.

63. Upon information and belief, despite this letter, as well as Dr. Day's history of

multiple complaints of sexism, racism, and discriminatory behaviour (including at least two

existing complaints with the Massachusetts Commission Against Discrimination (hereinafter

"MCAD")), Dr. Day was appointed as the Chairman of the Neurosurgery Department at BWH in

June 2007.

64. Dr. Day was asked to withdraw his nomination for the position of President Elect of

the American Association of Neurological Surgeons (hereinafter "AANS") in April 2008 after the

discrimination complaints that had been filed against him were widely publicized.

65. Dr. Day has a long and well-documented history of sexism, racism, and

discriminatory, retaliatory, unprofessional, and inappropriate behaviour towards his female

trainees, colleagues, co-workers, and staff.

66. Upon information and belief, Dr. Day, based upon discriminatory animus, has

refused to hire several women and minority physicians for both residency and other positions at

BWH.

13

67.  Starting from the time of his arrival at BWH in 2002, Dr. Day has displayed inappropriate, unprofessional, and sexist behaviour, and he was repeatedly reprimanded by Dr. Black and others in the Neurosurgery Department for his inappropriate and unprofessional behaviour.

68.  Between 2005 and 2007, three separate complaints against Dr. Day were filed with the MCAD. These complaints were filed by Dr. Soni, Dr. Narayanan, and Sagun Tuli, M.D. (hereinafter "Dr. Tuli"), who like Drs. Soni and Narayanan, is of Indian descent.

69.  Dr. Narayanan settled her case against Dr. Day and BWH in February 2008.

70.  Dr. Tuli currently is prosecuting a legal action against Dr. Day and BWH in the U.S. District Court for the District of Massachusetts (Civil Action No. 1:2007-cv-12338), and that case has been set for trial in January 2009.

71.  In demonstrating his sexist and racist attitudes, Dr. Day frequently confused Drs. Soni, Tuli, and Narayanan with one another, and he routinely called them each other's names. He also frequently compared Drs. Soni, Tuli, and Narayanan to one another despite their very different interests, personalities and backgrounds.

72.  When Dr. Day was upset with one of the three female Neurosurgery residents at BWH, he would lash out against the other two. In short, an action by Dr. Soni, Dr. Tuli, or Dr. Narayanan would prompt a reaction towards all three women.

73.  Dr. Proctor also has a history of inappropriate, unprofessional, hostile and discriminatory behaviour towards women and other minorities.

14

74.   Dr. Proctor had double standards when it came to male and female residents, and he regularly treated the male and female residents differently.  In fact, Dr. Proctor once chastised a female resident (Dr. Narayanan) for "complaining" – but he praised a male resident for his leadership and initiative when that resident brought up the same concerns and clinical issues that had been raised by Dr. Narayanan.

75.   Dr. Day berated Dr. Soni and cautioned her to stop complaining and cease her claims of disparate treatment.

76.   BWH has a long and widely publicized history of gender and race discrimination, with at least five (5) discrimination lawsuits (involving gender and/or national origin) having been filed in Massachusetts state or federal court during the past two years.

77.   There have been at least twenty-six (26) internal complaints, MCAD complaints, and/or U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") complaints filed against BWH since 2001.

78.   During her residency program at BWH, Dr. Soni was subjected to discrimination and retaliation, primarily at the hands of Dr. Day, the Residency Program Director and current Chair of the BWH Neurosurgery Department.  Her complaints of discrimination and retaliation against Dr. Day and BWH are pending before this Court (Civil Action No. 1:2008-cv-11875).

79.   Dr. Day is an extremely powerful man in the field of Neurosurgery, and he currently has or has had leadership positions in many of the organizations which support and represent Neurosurgeons.

15

80. Currently, Dr. Day serves as the co-chairman of the ACGME Neurosurgery Residency Review Committee, the national organization that accredits new and existing Neurosurgery residency training programs.

## DR. CHIN IS INFLUENCED BY DR. DAY

81. Dr. Chin has been influenced by Dr. Day's power and has retaliated and discriminated against Dr. Soni as a result. On information and belief, Dr. Day and Dr. Chin, in part based upon racial, sexual, and national origins animus, did cause and act in concert with each other to undertake the various unlawful acts set out herein.

82. Dr. Chin has been charged with the task of bringing a Neurosurgery residency training program to BMC.

83. Having a residency training program is very beneficial for a hospital, as they are prestigious and attract academic physicians to an institution.

84. In order to obtain a Neurosurgery residency program at BMC, Dr. Chin requires the approval of the Neurosurgery Residency Review Committee which Dr. Day co-chairs.

85. A prerequisite for obtaining a Neurosurgery residency program is to provide training in all neurosurgical subspecialties, including pediatric neurosurgery. BMC does not have an adequate pediatric Neurosurgical caseload to meet the requisite training requirements and as a result, future residents would need to fill their pediatric neurosurgery training requirements at Boston Children's Hospital. The decision to allow future BMC residents to rotate at Children's Hospital lies solely with Dr. Day.

16

86. In December 2007, Dr. Soni was compelled to inform Dr. Chin that she had filed a MCAD complaint against Dr. Day. Dr. Soni provided this information to Dr. Chin in light of the fact that newspaper reports regarding the multiple complaints filed against Dr. Day were being published.

87. Dr. Chin's immediate response was to ask Dr. Soni how her MCAD complaint would affect his ability to bring a Neurosurgery residency training program to BMC.

88. Shortly after reporting her claims of discrimination against Dr. Day to Dr. Chin, Dr. Chin began to criticize Dr. Soni's medical treatments and work at the hospital.

89. Dr. Chin is well aware of Dr. Day's power and influence in Neurosurgery. Dr. Chin and Dr. Day have many mutual friends in Neurosurgery.

90. Prior to her reporting her claims of discrimination against Day to Dr. Chin, Dr. Chin had considered employing Dr. Sagun Tuli. In a meeting attended by Dr. Soni and other faculty members of BUNA, Dr. Chin stated that he could not hire Dr. Tuli, because hiring Dr. Tuli away from the BWH, where she is employed, might anger Dr. Day. Dr. Chin was worried that hiring Dr. Tuli could negatively impact BMC's ability to obtain a Neurosurgery residency program. Dr. Chin was clearly aware of Dr. Day's power.

91. Prior to her reporting her claims of discrimination and retaliation, against Dr. Day to Dr. Chin, Dr. Chin had not communicated any problems to Dr. Soni regarding her work. In fact Dr. Soni approached Dr. Chin in January for a performance review and specifically asked him if he had any issues with her patient care and/or her administrative duties. Dr. Chin replied that Dr. Soni was meeting all of her job requirements and that there were no issues to discuss.

17

92. Shortly after reporting her claims of discrimination and retaliation to Dr. Chin, Dr. Chin began to criticize Dr. Soni's work.

93. At around this same time that Dr. Chin began criticizing her work, Dr. Soni's name appeared as a witness on Dr. Tuli's witness list to testify against Dr. Day.

94. Also, at around this same time and prior to this time, Dr. Soni reported patient safety issues and concerns to Dr. Chin and others within BMC.  Her reports angered Dr. Chin.

## REIMBURSEMENT FOR HOSPITAL SERVICES
## UNDER THE MEDICARE PROGRAM

95. The United States Department of Health and Human Services (hereinafter "DHHS") administers the federal Medicare program under the Social Security Act (hereinafter "the Act").

96. The Medicare program pays hospitals for covered services and items furnished when their rendering or use is determined to be medically reasonable and necessary.

97. The Medicare program pays for inpatient hospital treatment, covered services, items and tests ordered by a physician when those services are determined to be medically reasonable and necessary.

98. The Medicare program pays for covered medical services.  To be covered medical services, the services must be ordered and/or rendered by a medical doctor and must be reasonable and necessary to the treatment of the patient's medical condition.

99. Hospitals must be approved by the Centers for Medicare & Medicaid Services (hereinafter "CMS") before they may furnish medical services and submit claims for payment to the federal government for patients covered under the Medicare and Medicaid Programs.

100. Pursuant to 42 CFR Part 482, hospitals must comply with specific Conditions of Participation in order to be approved as providers that are entitled to payments under the Medicare and Medicaid programs.

101. Pursuant to 42 CFR Part 482, hospitals that are approved as Medicare and Medicaid providers must continue to comply with specific Conditions of Participation in order to be entitled to payments under those Federal Health Care Programs.

102. Pursuant to 42 CFR Part 488, in order to be approved for participation in or coverage under the Medicare and Medicaid programs, hospitals must be in compliance with certain conditions including those conditions and requirements prescribed in 42 CFR Part 482.

## PLAINTIFF'S STATEMENT OF THE FACTS IN SUPPORT OF HER FALSE CLAIMS ACT (FCA) AND RETALIATION CLAIMS [Factual Basis Not Limited To This Section]

103. Plaintiff Dr. Soni is a Neurosurgeon who was employed by BUNA, a faculty practice corporation for the Department of Neurosurgery of the BMC.

104. As part of her employment with BUNA which commenced in July 2007, Dr. Soni had appointments as an assistant professor at BUSM and as a staff Neurosurgeon at BMC.

105. As an employee of BUNA and as a Neurosurgeon with BMC, Dr. Chin served as Dr. Soni's immediate supervisor.

106. Dr. Chin had been hired by BMC on the recommendation of his mentor Steven Giannotta, M.D. (hereinafter "Dr. Giannotta") who had trained Dr. Chin in Neurosurgery at the University of Southern California.

107. Dr. Chin had been hired by BMC with the hope and expectation that he would be able to establish a Neurosurgery residency training program at BMC.

19

108.   Dr. Chin had recruited and hired Dr. Soni as a Neurosurgeon based in part on her strong academic background, which she demonstrated as an undergraduate student at the University of Michigan (located in Ann Arbor, Michigan) and as a medical school student at the Howard University College of Medicine (located in Washington, D.C.).

109.   Dr. Chin had recruited and hired Dr. Soni as a Neurosurgeon based in part on her superior post-graduate medical training as a Neurosurgeon from 1998 through 2007 at BWH which is located in Boston, Massachusetts.

110.   Dr. Chin had recruited and hired Dr. Soni as a Neurosurgeon, starting in July 2007, based in part on the additional medical training that she was pursuing in Australia from the summer of 2006 until the summer of 2007.  During that time, Dr. Soni worked as a Fellow in Skull Base and Cerebrovascular Neurosurgery.

111.   After Dr. Chin started actively working as the Chairman of the Neurosurgery Department at BMC in or about May 2006, a number of longtime Neurosurgeons left their positions at the hospital.

112.   After he started actively working as the Chairman of the Neurosurgery Department at BMC in or about May 2006, Dr. Chin engaged in an improper, intimate relationship with a Neurosurgery Fellow named Tanveer Zamani, M.D.

113.   When the relationship between Dr. Chin and Dr. Zamani came to light, BMC replaced Dr. Zamani as a Neurosurgery Fellow and oversaw her relocation to Ohio.

114.   Dr. Zamani was a female Neurosurgery Fellow of South Asian (Indian and Pakistani) descent.

20

115.   Upon information and belief, Dr. Chin's blemished start in the Neurosurgery Department at BMC created an environment in which he sought to not "make waves" with the hospital management.

116.   Upon information and belief, Dr. Chin became focused on establishing a Neurosurgery residency program at BMC.

117.   Upon information and belief, Dr. Chin's blemished start in the Neurosurgery Department at BMC created an environment in which he sought to maximize revenues for the hospital.

118.   Upon information and belief, Dr. Chin's blemished start in the Neurosurgery Department at BMC created an environment in which he sought to portray himself as the top billing physician in the Neurosurgery Department – even to the detriment of the other Neurosurgeons who worked with him at BMC.

119.   Upon information and belief, Dr. Chin's blemished start in the Neurosurgery Department at BMC created an environment in which he sought to ignore and/or downplay medical quality assurance and patient care concerns, in deference to producing revenues.

120.   The occurrence of gender discrimination in Neurosurgery is well documented.

121.   Due to the very limited number of Neurosurgeons in the United States, many Neurosurgeons know each other professionally.  This fact makes it easy to "blackball" one particular Neurosurgeon from the community of Neurosurgeons, thus increasing the damages suffered by a Neurosurgeon whose employment is terminated.

122.  Dr. Day is one of seven committee members on the ACGME Residency Review Committee -- that is, the responsible committee that accredits new Neurosurgery residency training programs; and Dr. Day currently co-chairs that committee.

123.  Dr. Day's position as the Chairman of the ACGME Residency Review Committee makes him a key decision-maker in connection with Dr. Chin's hopes to establish a Neurosurgery residency program at BMC.

124.  Dr. Day's cooperation was also essential to Dr. Chin's hopes of establishing a Neurosurgery residency program at BMC because Dr. Day's assistance was needed in creating an agreement between Children's Hospital and BMC that would permit BMC residents to train in the field of pediatric Neurosurgery, a necessary prerequisite for BMC to obtain a Neurosurgery residency program.

125.  Upon information and belief, Dr. Chin's strong desire to bring a Neurosurgery residency program to BMC created an environment in which he sought to maximize the revenues generated by the hospital's Neurosurgery Department, and in which he sought to ignore and/or downplay medical quality assurance and patient care concerns, as well as to eliminate all impediments to being approved.

126.  Dr. Chin did not provide to Dr. Soni regular evaluations with regard to the Neurosurgery services that were being provided to patients at BMC, and he failed to provide such evaluations to the other Neurosurgeons at the hospital.

127.  The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to the hospital's Governing Body (42 CFR

§482.12), Patient's Rights (42 CFR §482.13), Quality Assessment and Performance Improvement
Program (42 CFR §482.21), and Medical Staff (42 CFR §482.22).

128.  Dr. Soni investigated whether the failure of BMC to provide regular evaluations to
the hospital's Neurosurgeons violated 42 CFR §482.12, 42 CFR §482.13, 42 CFR §482.21 and/or
42 CFR §482.22.

129.  Although Dr. Soni did not receive a formal evaluation of her Neurosurgical services
from Dr. Chin, Dr. Chin had not communicated any problems to Dr. Soni regarding the medical
services provided by her prior to December 2007.

130.  Although Dr. Soni did not receive a formal evaluation of her Neurosurgical services
from Dr. Chin, when she sought an evaluation from Dr. Chin in January 2008, Dr. Chin advised
her that she was meeting all of her job requirements and that there were no issues to discuss.

131.  Shortly after reporting her claims of discrimination against Dr. Day to Dr. Chin, Dr.
Chin began to criticize Dr. Soni's medical treatments and work at the hospital.

**Initial Quality Assurance Issues Raised By Dr. Soni**

132.  In or about January 2008, Dr. Soni started to escalate her reports regarding patient
safety issues and concerns at the hospital to Dr. Chin and others at BMC.

133.  Dr. Soni brought numerous complaints regarding patient care and billing issues at
the hospital to the attention of Dr. Chin and other Medical Doctors (including Neurosurgeons),
Fellows, P.A.'s, and nurses at BMC.

134.  Dr. Soni observed that a large percentage of the patients treated at BMC were
beneficiaries in the Medicare, Medicaid, and other Federal Health Care Programs.

135. Dr. Soni raised numerous complaints and concerns regarding hospital quality control issues which led to longer surgeries and longer hospital stays, which resulted in higher medical billings.

136. Dr. Soni started to perform surgeries at BMC in August 2007, at which time she found that she had little or no support clinically; in fact, Dr. Soni often had to perform long and complex surgeries without the assistance of another Neurosurgeon or Neurosurgery Fellow.

137. The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to Patient's Rights (42 CFR §482.13) and Medical Staff (42 CFR §482.22).

138. Dr. Soni investigated whether BMC had violated 42 CFR §482.13 and/or 42 CFR §482.22.

139. The specific facts that relate to BMC's possible violations of 42 CFR §482.13 and 42 CFR §482.22 will be disclosed upon authorization of the Court.

140. Dr. Soni also received little or no help administratively, including assistance that she needed – and that was provided to other Neurosurgeons in the Department – to complete medical records in a professional and timely fashion.

141. Starting in or about January 2008, Dr. Soni escalated her verbal complaints and concerns regarding patient care issues to Dr. Chin and to Vincent Falco who worked as the administrator for the BMC Neurosurgery Department.

142. Starting in or about January 2008, Dr. Soni started to submit her complaints and concerns regarding patient care issues to Dr. Chin and to Vincent Falco in writing.

24

143.  Dr. Chin prevented Dr. Soni from expressing her patient care concerns to Paul Drew who served as the assistant to BMC President and Chief Executive Officer Elaine Ullian.

**Fraudulent Billings**

144.  Dr. Soni found that in his efforts to maximize revenues for the BMC Neurosurgery Department, Dr. Chin submitted fraudulent claims to one or more third party payers.

145.  The specific facts, and to whom complaints were made, that relate to fraudulent billings by BMC and Dr. Chin will be disclosed upon authorization of the Court.

**Lack Of Necessary Surgical And Postoperative Care On Neurosurgery Cases**

146.  On most of her cases, Dr. Soni was forced to perform the surgery by herself; that is, Dr. Chin required Dr. Soni to perform complex Neurosurgical procedures without the assistance of another Neurosurgeon or a Neurosurgery Fellow.

147.  Dr. Chin, by contrast, always was assisted in surgery by another Neurosurgeon or by a Neurosurgery Fellow (such as Neurosurgery Fellow Dr. Mayur Jayarao).

148.  Dr. Soni was forced to perform complex surgeries with only P.A.'s present.

149.  Dr. Soni found that the inadequate assistance provided to her during surgeries could lead to medical complications and/or longer operations, which in turn led to longer hospital stays for patients and higher billings (including billings submitted to the Medicare and Medicaid programs).

150.  The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to Nursing Services (42 CFR §482.23).

151.  Dr. Soni investigated whether BMC violated 42 CFR §482.23.

25

152.   The specific facts, and to whom complaints were made, that relate to BMC's possible violations of 42 CFR §482.23 will be disclosed upon authorization of the Court.

**Post-Operative Care for Patients**

153.   Dr. Soni complained that although she had been hired to handle complex Neurosurgery procedures at BMC, the hospital did not have the infrastructure or post-operative care necessary to handle these types of cases.

154.   The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to the hospital's Quality Assessment and Performance Improvement Program (42 CFR §482.21), Medical Staff (42 CFR §482.22), Nursing Services (42 CFR §482.23), and Infection Control (42 CFR §482.42).

155.   Dr. Soni investigated whether BMC violated 42 CFR §482.21, 42 CFR §482.22, 42 CFR §482.23, and 42 CFR §482.42.

156.   The specific facts, and to whom complaints were made, that relate to BMC's possible violations of 42 CFR §482.21, 42 CFR §482.22, 42 CFR §482.23, and 42 CFR §482.42 will be disclosed upon authorization of the Court.

**Insufficient Equipment And Facilities At BMC**

157.   Dr. Soni complained that BMC maintained inadequate equipment and facilities for the safe and appropriate treatment of Neurosurgery patients.

158.   Dr. Soni raised concerns that BMC billed for extra hospital days due to preventable delays in performing surgeries as a direct result of its failure to maintain adequate equipment.

159.   Dr. Soni raised concerns that BMC billed for extra hospital days due to preventable Neurosurgery patient complications.

26

160. The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to the hospital's Governing Body (42 CFR §482.12), Patient's Rights (42 CFR §482.13), Quality Assessment and Performance Improvement Program (42 CFR §482.21), Medical Staff (42 CFR §482.22), and Surgical Services (42 CFR §482.51).

161. Dr. Soni investigated whether BMC violated 42 CFR §482.12, 42 CFR §482.13, 42 CFR §482.21, 42 CFR §482.22 and/or 42 CFR §482.51.

162. The specific facts, and to whom complaints were made, that relate to BMC's possible violations of 42 CFR §482.12, 42 CFR §482.13, 42 CFR §482.21, 42 CFR §482.22, and 42 CFR §482.51 will be disclosed upon authorization of the Court.

**Surgical Delays and Inadequate Clinical Support for Dr. Soni In the Operating Room**

163. Dr. Soni complained of numerous surgical delays and inadequate support and assistance when she performed Neurosurgical procedures.

164. Delays in patient treatment led to additional Intensive Care Unit (hereinafter "ICU") services being billed to the Federal Health Care Programs.

165. In or about February 2008, Dr. Soni raised additional concerns to the Neurosurgery Department chairman Dr. Chin and to the Department administrator Vincent Falco regarding the lack of professionalism within the Neurosurgery Department and surgery delays, resulting in higher medical billings.

166. At the request of Mr. Falco, Dr. Soni memorialized and submitted these concerns in writing.

167.  Less than two weeks later, Dr. Chin and BMC retaliated against Dr. Soni (as will be detailed below).

168.  The specific facts, and to whom complaints were made, that relate to BMC's possible violations of Medicare Conditions of Participation stemming from the surgery delays and insufficient clinical support provided to Dr. Soni will be disclosed upon authorization of the Court.

**BMC's Failures To Follow Up On Patient Infections**

169.  Dr. Soni complained of numerous and repeated infections afflicting the Neurosurgical patients at BMC, as well as the inadequate steps taken by BMC to address these patient infections.

170.  The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to Infection Control (42 CFR §482.42) and Patient's Rights (42 CFR §482.13).

171.  Dr. Soni investigated whether BMC violated 42 CFR §482.42 and/or 42 CFR §482.13.

172.  The specific facts, and to whom complaints were made, that relate to BMC's possible violations of 42 CFR §482.42 and 42 CFR §482.13 will be disclosed upon authorization of the Court.

**Over-Billing At BMC For Neurosurgery Procedures**

173.  Dr. Soni complained of billings within the BMC Department of Neurosurgery for unnecessary and/or excessive medical items and treatments.

28

174. The specific facts, and to whom complaints were made, that relate to BMC's possible excessive and medically unnecessary billings will be disclosed upon authorization of the Court.

**Unnecessary Surgical Procedures**

175. Dr. Soni complained of unnecessary surgical procedures that were performed at BMC, including surgeries that were encouraged and mandated by Dr. Chin.

176. The specific facts, and to whom complaints were made, that relate to unnecessary and potentially dangerous surgeries within the BMC Department of Neurosurgery will be disclosed upon authorization of the Court.

**Dr. Chin's Failures In Managing The BMC Neurosurgery Department**

177. Dr. Chin failed to hold monthly (or other regularly scheduled) meetings of the Neurosurgeons that he was charged with managing.

178. While Dr. Soni believed that regular Neurosurgery Department meetings were necessary to address patient care issues and cost effective medical practices, Dr. Chin only held two Department meetings during a ten-month period.

179. Dr. Chin sought to maximize his own medical billings, and he delegated the day-to-day management of the BMC Neurosurgery Department to others, including to P.A. Thai Vu.

180. Dr. Ameri, who has worked as a Neurosurgeon at BMC on a contractual basis for nearly twenty years, did not respect Dr. Chin's management of the hospital's Neurosurgery Department, and he refused to attend Department meetings on the rare occasions when they were

scheduled.  Dr. Ameri also declined to attend the Department of Neurosurgery's weekly (mortality and morbidity/quality assurance) case conferences.

181.  Non-physician staff affiliated with the BMC Neurosurgery Department were not adequately trained to work on Neurosurgery cases.

182.  Due to Dr. Chin's failures to actively manage the Neurosurgery Department and to provide Dr. Soni with the clinical and administrative support that she needed (and which she had been repeatedly promised) directly led to delays in the preparation of progress notes and discharge summaries.

183.  The refusal of BMC and Dr. Chin to provide Dr. Soni with the same clinical and administrative support given to other Neurosurgeons at the hospital constituted disparate treatment from male and non-Indian physcians.

184.  Dr. Chin promised that a Bonus Plan would be implemented to reward the most productive and hardest working Neurosurgeons at BMC.

185.  Dr. Chin failed to implement the Bonus Plan, and he continued to work personally on the cases that he believed would generate the most revenue for the hospital and would portray him as the top billing Neurosurgeon to the hospital management.

186.  Upon information and belief, Dr. Chin was awarded monetarily by BMC based on the number of surgeries that he personally performed and for the revenues generated on his cases.

187.  Upon information and belief, Dr. Chin performed medically unnecessary surgeries and unnecessarily costly surgeries in order to maximize his own income and in order to maximize the Neurosurgery Department's revenues.

188.   The specific facts, and to whom complaints were made, that relate to Dr. Chin's inadequate management of the BMC Department of Neurosurgery will be disclosed upon authorization of the Court.

## Over-Billing For Routine Surgical Procedures

189.   Dr. Soni complained that BMC submitted excessive bills for routine surgical procedures that were performed by Neurosurgeons, rather than by other hospital personnel.

190.   Dr. Chin insisted that Dr. Soni and other Neurosurgeons at BMC perform these procedures so that the higher Neurosurgeon's rates could be billed to third party payers.

191.   The specific facts, and to whom complaints were made, that relate to excessive billings within the BMC Department of Neurosurgery will be disclosed upon authorization of the Court.

## Over-Billing For Emergency Room Services

192.   Emergency Room services are generally billed at a higher rate than other hospital services.

193.   The Code of Federal Regulations sets forth the Medicare Conditions of Participation that are mandated for all hospitals with regard to Emergency Services (42 CFR §482.55).

194.   Dr. Soni investigated whether BMC violated 42 CFR §482.55.

195.   The specific facts, and to whom complaints were made, that relate to BMC's possible violations of 42 CFR §482.55 will be disclosed upon authorization of the Court.

## RETALIATION AND DISCRIMINATION AGAINST DR. SONI
### [Factual Basis Not Limited To This Section]

196.   Dr. Soni was employed by BUNA, and she was employed by and served as an Assistant Professor at  BUSM and BMC. Additionally, she served as a member of the medical staff at BMC as an attending neurosurgeon.  BU issued Dr. Soni's paychecks to her and provided for her benefits.

197.   Upon information and belief, BUNA transferred funds to BU to pay for Dr. Soni's salary and benefits.

198.   Dr. Chin is a professor and department chairman of BUSM, and in that capacity, he is an employee of BU.

199.   Dr. Chin is the Chairman of the Department of Neurosurgery and is an attending Neurosurgeon at BMC.

200.   Dr. Chin is the President and Chief Executive Officer of BUNA.

201.   Upon information and belief, Defendants BMC and BU could not permit Dr. Soni to function as a faculty member of and on the medical staff of BMC and BU and still obtain Dr. Day's approval of Defendants' (BMC's and BU's) proposed Neurosurgery residency program.

202.   Defendants BUNA, BMC, and BU did, by and through Dr. Chin, terminate Dr. Soni from her positions as an employee, as an attending neurosurgeon, as a member of the medical staff, and as an Assistant Professor at Defendants BUNA, BMC, and BU for the reasons outlined in this Complaint; including but not limited to retaliation, and discrimination on the basis of sex, race, and national origin, and False Claims Act protected activity.

203. Pursuant to this discrimination and retaliation, Defendants BUNA, BMC, and BU denied Dr. Soni the functions of teaching students as an Assistant Professor, medical staff privileges, undertaking Neurosurgery case operations, and being a paid employee.

204. Defendant BU, while continuing to assert that Dr. Soni continues to hold the position of an Assistant Professor with BUSM, does not pay Dr. Soni, and does not afford Dr. Soni students to teach, nor a place in which to teach them, for the reasons stated in this Complaint, including but not limited to discrimination, and retaliation on the basis of sex, race, and national origin, and False Claims Act protected activity.

205. All Defendants, including BUNA, BMC, and BU, had a duty and obligation to prevent Dr. Chin from undertaking the unlawful acts perpetrated against Dr. Soni and detailed in this Complaint, but instead, these Defendants approved, ratified, caused, and endorsed these unlawful acts for the reasons set out herein.

206. Dr. Soni expressed her concerns regarding numerous quality assurance issues and medical billing matters to Dr. Chin (as agent of each and every Defendant herein) and to Vincent Falco (as the administrator of the BMC Neurosurgery Department).

207. Throughout January and February 2008, Dr. Soni continued to express concerns to her supervisors and superiors at BMC with regard to numerous quality assurance issues and medical billing matters.

208. Dr. Soni expressed her concerns to other staff at BMC, and the identity of the individuals to whom complaints were made will be disclosed upon authorization of the Court.

209.   Many of these individuals did not hold supervisory positions over Dr. Soni, but they had been affiliated with BMC for a longer period of time than Dr. Soni.

210.   Dr. Soni expressed her concerns to physicians and non-physicians, the identity of whom will be disclosed upon authorization of the Court.

211.   The attempts made by Dr. Soni to express her concerns regarding numerous quality assurance issues and medical billing matters to Paul Drew (*i.e.*, the assistant to the BMC President and Chief Executive Officer Elaine Ullian) were frustrated by Dr. Chin.

212.   Dr. Soni expressed her concerns regarding numerous quality assurance issues and medical billing matters to other hospital supervisors, the identity of whom will be disclosed upon authorization of the Court.

213.   At the request of the BMC Neurosurgery Department administrator Vincent Falco, in late February 2008, Dr. Soni placed additional concerns in writing (including her complaints pertaining to the lack of adequate clinical support during complex Neurosurgery procedures).

214.   Upon information and belief, Dr. Chin retaliated and discriminated against Dr. Soni in an effort to silence her investigation of patient safety issues and fraudulent billings at BMC which relate to Medicare/Medicaid program compliance.

### RETALIATION AGAINST DR. SONI IN ASSOCIATION WITH DR. DAY

215.   Dr. Chin was persistently and vocally pre-occupied with the task of establishing a Neurosurgery residency training program at BMC.

216.   Dr. Chin was well aware that Dr. Day was a key decision-maker on the issue of whether BMC would be permitted to establish a Neurosurgery residency training program at BMC.

217.   Upon information and belief, Dr. Chin and Dr. Day communicated directly with regard to BMC's chances for obtaining a Neurosurgery residency training program.

218.   Dr. Chin repeatedly expressed fear of Dr. Day to Dr. Soni and other members of the BMC Neurosurgery Department and to the Neurosurgery community at large.

219.   Dr. Chin was so concerned about Dr. Day that he refused to hire Dr. Tuli as a spine Neurosurgeon.  Dr. Chin believed that hiring Dr. Tuli would  upset Dr. Day.

220.   Upon information and belief, Dr. Day sought to retaliate against Dr. Soni for her involvement with the discrimination claims that had been filed against him.

221.   In early February 2008, Dr. Soni saw and spoke with Dr. Giannotta at a Neurosurgery conference in Las Vegas.

222.   Dr. Soni knew that Dr. Gianotta had been Dr. Chin's mentor when Dr. Chin received his Neurosurgery residency training at the University of Southern California.

223.   Dr. Soni knew that Dr. Giannotta was a close personal friend and professional colleague of Dr. Day.

224.   At the Las Vegas conference, Dr. Giannotta stated to Dr. Soni, "I know who you are," and he commented on Dr. Soni's strong interest in the sub-specialty of cerebrovascular Neurosurgery – an interest that was shared by Dr. Day.

225.   In late February 2008, Dr. Soni attended a national Neurosurgery meeting in New Orleans where other male Neurosurgeons who were friendly with Dr. Day openly mocked her.

226.  At a social event sponsored in connection with the New Orleans meeting, Dr. Soni and Dr. Day saw each other for the first time since late June 2006 when Dr. Soni had graduated from her Neurosurgery residency program at BWH.

227.  Within one week of returning to BMC from the New Orleans meeting, Dr. Chin retaliated against Dr. Soni.

228.  Upon information and belief, Dr. Day sought to retaliate against Dr. Soni for filing a discrimination claim against him based upon sex, race, and national origin.

229.  Upon information and belief, Dr. Day sought to retaliate against Dr. Soni for supporting other female Neurosurgeons in connection with their own discrimination complaints against Dr. Day based upon sex, race, and national origin.

230.  Upon information and belief, Dr. Chin communicated with Dr. Day and/or with Dr. Gianotta and/or other members of the Neurosurgery community immediately prior to retaliating against Dr. Soni.

231.  Upon information and belief, Dr. Chin retaliated against Dr. Soni in connection with his efforts to establish a Neurosurgery residency training program at BMC and to obtain Dr. Day's approval of the program as Chairman of the ACGME Residency Review Committee.

232.  Upon information and belief, Dr. Chin retaliated and discriminated against Dr. Soni in an effort to silence her investigation of patient safety issues and fraudulent billings at BMC which relate to Medicare/Medicaid program compliance.

## TERMINATION OF DR. SONI

233.  On March 3, 2008, Dr. Chin verbally informed Dr. Soni that BMC intended to terminate her employment with the hospital.

36

234. Initially, Dr. Chin advised Dr. Soni that she was being terminated for her failure to timely complete medical records and medical billing forms.

235. Dr. Chin then advised Dr. Soni that she was being terminated because her employment at the hospital simply was not working out.

236. On March 3, 2008, Dr. Soni wrote a formal grievance letter to Karen Antman, M.D. who served as the Dean of the Boston University School of Medicine.

237. Dr. Soni's letter to Dr. Antman detailed the hostility and retaliation to which she (Dr. Soni) had been subjected by Dr. Chin.

238. Dr. Antman did not respond substantively to Dr. Soni's letter and opted to let the BMC management and attorneys handle the dispute between Dr. Soni and the hospital.

239. On March 18, 2008, Dr. Chin sent a letter to Dr. Soni advising her that she was being terminated from her employment with BMC, effective in sixty (60) days.

240. Upon information and belief, Dr. Chin sought to terminate Dr. Soni's employment in retaliation for raising concerns regarding quality assurance issues, medical billing matters, and Medicare/Medicaid program compliance.

241. Upon information and belief, Dr. Chin sought to terminate Dr. Soni's employment in order to gain favor with Dr. Day and in the hope that terminating Dr. Soni would increase the chances of BMC obtaining Dr. Day's approval (as Chairman of the ACGME Residency Review Committee) for a Neurosurgery residency training program.

242. Upon information and belief, within one month of advising Dr. Soni that her employment with BMC was being terminated, Dr. Chin submitted BMC's formal application for

the establishment of a Neurosurgery residency training program to the ACGME Residency Review Committee chaired by Dr. Day.

243.   BMC has maintained that Dr. Soni was terminated for failure to timely complete medical records and medical billing forms.

244.   BMC's stated reason for Dr. Soni's termination was a pretext intended to cover up that she was in fact being terminated for raising quality assurance issues, medical billing matters, and Medicare/Medicaid program compliance issues to hospital personnel.

245.   BMC's stated reason for Dr. Soni's termination was a pretext intended to cover up that she was in fact being terminated in conjunction with an agreement with Dr. Day, as retaliation for filing a discrimination complaint against Dr. Day charging him with sex, race, and national origin violations, and/or for supporting other minority physicians with similar complaints.

246.   Failures on the part of Dr. Soni to timely complete medical records and medical billing forms were caused by BMC's failure to provide her with adequately trained administrative support staff and by BMC's failure to properly train and supervise the personnel who were charged with preparing the initial drafts of many medical records for Dr. Soni while white, male Neurosurgeons were afforded sufficiently trained staff.

247.   Failures on the part of Dr. Soni to timely complete medical records and medical billing forms were caused by BMC's refusal to provide her with the minimal administrative assistance provided to white, male Neurosurgeons employed by the hospital and by BMC's requirements that Dr. Soni perform approximately twice as many on-call hours as white, male Neurosurgeons employed by the hospital.

38

248.   Such disparate treatment was motivated by discrimination.

249.   Commonly, medical staff By-Laws do not provide for termination of staff privileges due to medical record filing deficiencies.

250.   The Massachusetts Medical Board prohibits disciplinary actions being taken against physicians for administrative tasks, such as the failure to timely complete medical records.

251.   BMC medical staff By-Laws provide, at most, for administrative suspension due to untimely record keeping.

252.   White and/or male Neurosurgeons are not terminated from BMC, nor are their medical staff privileges at BMC terminated, based upon untimely record keeping.

253.   Prior to March 3, 2008, neither Dr. Chin nor any other person affiliated with BMC informed Dr. Soni that her employment was in jeopardy and/or that her failure to timely complete medical records and billing forms could lead to her termination.

254.   Upon information and belief, medical doctors – particularly talented and specially trained Neurosurgeons – are not terminated by hospitals for an alleged failure to timely complete medical and billing records.

255.   After BMC terminated Dr. Soni's employment, then BUNA, BU, and BUSM, effectively terminated Dr. Soni's employment and functioning as well, including but not limited to denying her teaching responsibilities, residents and/or students to teach, and surgical cases to work on.

256.   Upon information and belief, Defendants BMC, BUNA, BU, Dr. Chin, and Dr. Day (collectively referred to hereinafter as "Defendants") acted in concert to carry out the

discriminatory acts and retaliatory acts perpetrated against Dr. Soni, including ongoing harassment of Dr. Soni, including but not limited to failing to provide true and correct credentialing documentation to potential employers and other credentialing entities and sources of employment.

257.   Upon information and belief, Defendants acted in concert to approve, ratify, cause, and/or endorse the unlawful conduct perpetrated against Dr. Soni.

## CLAIM I:  UNLAWFUL RETALIATION UNDER THE FALSE CLAIMS ACT

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 257, as if fully stated herein.

258.   Pursuant to 31 U.S.C. §3730(h) of the False Claims Act (hereinafter "FCA"), any employee who is discharged, demoted, suspended, threatened, harassed and otherwise discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done under the FCA is entitled to all relief necessary to make the employee whole.

259.   Starting in or about March 2008, Defendants attempted to – and ultimately did – discharge Dr. Soni from her employments for reasons contrary to public policy, as set out in 31 U.S.C. §3730(h) and without just cause.

260.   Defendants, in discharging, suspending, demoting, threatening and harassing Dr. Soni in and from her employments, retaliated and discriminated against her because of complaints and concerns raised by her to Defendants regarding their repeated and continual failure to comply with minimal Conditions of Participation in the Medicare Program and their repeated and continual fraudulent billings to the Federal Health Care Programs.

40

261. The acts of Defendants in, demoting, suspending, threatening, harassing, discriminating, and retaliating against Dr. Soni, including but not limited to the wrongful discharge of employments, denial of teaching responsibilities and functions, denial of true and correct credentialing documentation, denial of surgical cases to work upon and termination of Dr. Soni by Defendants in her employments, Assistant Professor status, medical staff privileges, attending Neurosurgeon status, and salary payments, violated the provisions of 31 U.S.C. §3730(h).

262. Starting shortly after her employment at BMC started in July 2007 and continuing through the present date, Defendants have discriminated, suspended, demoted, threatened, harassed and retaliated against Dr. Soni for lawful conduct protected under the FCA.

263. Defendants have terminated, discharged, suspended, threatened, harassed, and discriminated against Dr. Soni in her employments in violation of 31 U.S.C. §3730(h).

264. After discharging Dr. Soni from her employments as a Neurosurgeon at BMC, BU, BUSM, and BUNA, Defendants continued to harass, threaten and discriminate against Dr. Soni.

265. Dr. Chin, acting in concert with other Defendants, has taken away Dr. Soni's patients and falsely implicated Dr. Soni in connection with patient complications. Defendants' harassment of Dr. Soni is ongoing by such actions, including but not limited to failing to provide true and correct credentialing documentation to potential employers and other credentialing entities and sources of employment.

266. Defendants have discriminated and retaliated against Dr. Soni for lawful and protected conduct in connection with her investigation for, initiation of, potential testimony concerning, and assistance in an action filed or to be filed under the FCA, 31 U.S.C. §3729 *et seq.*

41

267.  Dr. Soni is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination and two times the amount of back pay.

268.  Dr. Soni, pursuant to 31 U.S.C. §3730(h), is entitled to litigation costs and all reasonable attorneys' fees incurred in connection with this action and the defendants' related activity and post employment harassment and threats.

269.  Dr. Soni's conduct, including but not limited to investigating Defendants' violations of Medicare regulations (including but not limited to Medicare Conditions of Participation), investigating Defendants' failure to comply with medical standards of care, investigating fraudulent billings to the Federal Health Care Programs, and also raising complaints concerning same and bearing witness to violations of same, potential testimony concerning, potential initiation of and assistance in an action filed or potentially to be filed pertaining to the FCA, is all protected conduct under the FCA.

270.  Defendants knew that Dr. Soni was engaged in protected conduct as referenced herein.

271.  Defendants discharged, terminated, demoted, suspended, threatened, and harassed Dr. Soni from her employments and after her employments, and otherwise discriminated against her because of her protected conduct.

272.  As a direct and proximate result of the violations of 31 U.S.C. §3730(h) as referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her employments and has been substantially and significantly injured in her career path that was anticipated from her employments.

273.   As a direct and proximate result of the violations of 31 U.S.C. §3730(h) as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole.

## CLAIM II:  VIOLATIONS OF 42 U.S.C. §1981

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 257, as if fully stated herein.

274.   Dr. Soni is a female Neurosurgeon whose descent is Indian (non-white) race and national origin.

275.   Dr. Soni was the victim of retaliation and discrimination on the part of the Defendants.

276.   Defendants treated Dr. Soni in a negative and disparate fashion compared to white medical doctors employed by BUNA, compared to white members of the faculty at BU, and compared to white members of the medical staff at BMC.

277.   Defendant Dr. Day repeatedly acted with bias and discrimination towards Dr. Soni based upon her descent as an individual of Indian (non-white) race and national origin in the course of his professional affiliation with her and as the Chairman of the BWH Neurosurgery residency program.

278.   Pursuant to 42 U.S.C. §1981 (captioned Equal Rights Under The Law), all persons shall have the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

279.  Pursuant to 42 U.S.C. §1981, the term "make and enforce contracts" includes the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

280.  Pursuant to 42 U.S.C. §1981, the rights protected by the statute are protected against impairment by non-governmental discrimination.

281.  As a United States citizen whose descent is Indian (non-white) race and national origin, Dr. Soni is a member of a racial minority.

282.  Defendants impaired Dr. Soni's rights under this statute by discrimination against Dr. Soni on the basis of her race and national origin.

283.  Defendants' impairment of Dr. Soni's rights under this statute by discrimination implicated one or more of the activities enumerated under 42 U.S.C. §1981.

284.  Defendants' impairment by discrimination against Dr. Soni adversely effected her ability to make and enforce contracts in that Defendants adversely impaired Dr. Soni's enjoyment of all benefits, privileges, terms and conditions of her contracts with the Defendants, including but not limited to terminating and interfering with her employment with BUNA, terminating and interfering with her employment and position as a faculty member at BU/BUSM, and terminating and interfering with her employment and medical staff privileges as a Neurosurgeon at BMC, and by failing and refusing to truthfully and appropriately provide credentialing documentation to subsequent healthcare facilities, employers, entities and agencies whom defendants knew or should have known that Dr. Soni was seeking to enter contracts with and through.

285.  Defendants' discrimination against Dr. Soni interfered with her enjoyment of all benefits, privileges, terms, and conditions of her employment, and with her work as a faculty member at BU, and with her medical practice as a Neurosurgeon.

44

286.   As a direct and proximate result of the violations of 42 U.S.C. §1981 as referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her employments and contracts and has been substantially and significantly injured in her career path that was anticipated from her employments.

287.   As a direct and proximate result of the violations of 42 U.S.C. §1981 as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole.

### CLAIM III:  RETALIATION UNDER 42 U.S.C. §1981

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 257 and 274 through 287, as if fully stated herein.

288.   Dr. Soni is a female Neurosurgeon whose descent is Indian (non-white) race and national origin.

289.   In April 2007, Dr. Soni filed a MCAD Complaint against BWH and Dr. Day for discrimination based in part on her Indian (non-white) race and national origin.

290.   Defendants retaliated against Dr. Soni in violation of 42 U.S.C. §1981 in response to her filing a discrimination complaint against BWH and Dr. Day, and in order to obtain Dr. Day's approval of a Neurosurgery residency training program at BMC.

291.   Dr. Narayanan and Dr. Tuli are female Neurosurgeons whose descent is Indian (non-white) race and national origin.

292.   Dr. Narayanan and Dr. Tuli were Neurosurgery residents at BWH, and they were discriminated against by BWH and Dr. Day based on their race and national origin.

293.  Dr. Narayanan and Dr. Tuli filed discrimination complaints against Dr. Day.

294.  Dr. Soni has supported and provided assistance to Dr. Narayanan and Dr. Tuli in connection with their discrimination complaints filed against Dr. Day.

295.  Defendants retaliated against Dr. Soni in violation of 42 U.S.C. §1981 for the support and assistance that she provided to Dr. Narayanan and Dr. Tuli in connection with their discrimination complaints, and in order to obtain Dr. Day's approval of a Neurosurgery residency training program at BMC.

296.  Dr. Zamani was a Neurosurgery Fellow who worked at BMC and whose descent is South Asian (Indian and Pakistani) race and national origin.

297.  Upon information and belief, Defendants continued and escalated their retaliation against Dr. Soni in violation of  42 U.S.C.  §1981 after Defendants learned that Dr. Soni had contacted Dr. Zamani -- and that Dr. Soni had discussed with Dr. Zamani her (Dr. Zamani's) termination from the BMC Department of Neurosurgery.

298.  Defendants' retaliation against Dr. Soni in violation of 42 U.S.C. §1981 impaired and interfered with her contractual enjoyment and performance of all benefits, privileges, terms, and conditions of her employments, with her work as a faculty member at BU/BUSM, with her employment and medical practice as a Neurosurgeon with BMC and BUNA and with her future contracts due to past and ongoing violations as set out throughout this complaint.

299.  As a direct and proximate result of the violations of 42 U.S.C. §1981 as referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her employments and contracts and has been substantially and significantly injured in her career path that was anticipated from her employments.

300.   As a direct and proximate result of the violations of 42 U.S.C. §1981 as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole.

## CLAIM IV:  VIOLATIONS OF 42 U.S.C. §2000e *et seq.*

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 257 and 274 through 287, as if fully stated herein.

301.   Dr. Soni is a female Neurosurgeon whose descent is Indian (non-white) race and national origin.

302.   As a female and as an individual of Indian race and national origin, Dr. Soni is a member of a protected class.

303.   As a licensed Medical Doctor and a trained Neurosurgeon, Dr. Soni was qualified for the positions that she held with Defendants as an attending physician, as a Neurosurgeon with hospital staff privileges, and as an Assistant Professor.

304.   Defendants discharged and discriminated against Dr. Soni with respect to her terms, conditions, and privileges of employment because of her sex, race, and national origin.

305.   Defendants limited, segregated, and classified Dr. Soni in a manner which deprived and tended to deprive Dr. Soni of employment opportunities and otherwise adversely affected her status as an employee because of her race, sex and national origins.

306.   After Dr. Soni's termination from employment by Defendants, the positions remained open or were filled by another person who had similar qualifications as Dr. Soni.

307.  Defendants discriminated against Dr. Soni, and treated her in a disparate fashion compared to male medical doctors, based on her female gender.

308.  Defendants discriminated against Dr. Soni, and treated her in a disparate fashion compared to white, non-Indian medical doctors, because of her descent and Indian race.

309.  Defendants discriminated against Dr. Soni, and treated her in a disparate fashion compared to white, non-Indian medical doctors, because of her descent and Indian national origin.

310.  Defendants discriminated against Dr. Soni by discharging her from employment and by otherwise interfering with her employment and with her work as a Neurosurgeon, her work on the faculty at BU, and with her medical staff privileges as a Neurosurgeon at BMC.

311.  Defendants' discriminated against Dr. Soni in violation of 42 U.S.C. §2000e *et seq.* by interfering with her enjoyment of all benefits, privileges, terms, and conditions of her employment, and with her work as a faculty member at BU, and with her medical practice as a Neurosurgeon.

312.  As a direct and proximate result of the violations of 42 U.S.C. §2000e *et seq.* as referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her employments and has been substantially and significantly injured in her career path that was anticipated from her employments.

313.  As a direct and proximate result of the violations of 42 U.S.C. §2000e *et seq.* as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole as provided for under 42 USC §2000e *et seq.*

48

## CLAIM V:  RETALIATION UNDER 42 U.S.C. §2000e *et seq.*

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 257, 274 through 287, and 301 through 313, as if fully stated herein.

314.  Dr. Soni is a female Neurosurgeon whose descent is Indian (non-white) race and national origin.

315.  In April 2007, Dr. Soni filed a MCAD Complaint against BWH and Dr. Day for discrimination based on her Indian (non-white) race and national origin and for sex discrimination.

316.  Defendants discriminated and retaliated against Dr. Soni in violation of 42 U.S.C. §2000e *et seq.* in response to her filing a discrimination complaint against BWH and Dr. Day, and in order to obtain Dr. Day's approval of a Neurosurgery residency training program at BMC.

317.  Dr. Narayanan and Dr. Tuli are female Neurosurgeons whose descent is Indian (non-white) race and national origin.

318.  Dr. Narayanan and Dr. Tuli were Neurosurgery residents at BWH, and they were discriminated against by BWH and Dr. Day based on their race and national origin and based on their female gender.

319.  Dr. Narayanan and Dr. Tuli filed discrimination complaints against Dr. Day.

320.  Dr. Soni has supported and provided assistance to Dr. Narayanan and Dr. Tuli in connection with their discrimination complaints filed against Dr. Day.

321.  Defendants discriminated and retaliated against Dr. Soni in violation of 42 U.S.C. §2000e *et seq.* for undertaking protected activity under 42 U.S.C. §2000e *et seq.* that she provided

49

to Dr. Narayanan and Dr. Tuli in connection with their discrimination complaints, and in order to
obtain Dr. Day's approval of a Neurosurgery residency training program at BMC.

322.   Dr. Zamani was a Neurosurgery Fellow who worked at BMC and whose descent is
South Asian (Indian and Pakistani) race and national origin.

323.   Defendants discriminated and retaliated against Dr. Soni in violation of 42 U.S.C.
§2000e *et seq.* after she undertook protected activity under 42 U.S.C. §2000e *et seq.* in regards to
Dr. Zamani's termination from the BMC Department of Neurosurgery, and in order to
obtain Dr. Day's approval of a Neurosurgery residency training program at BMC.

324.   Defendants discriminated and retaliated against Dr. Soni based on her undertaking
protected activity under 42 U.S.C. §2000e-3 in opposition to unlawful employment practices
against her under 42 U.S.C.  §2000e *et seq.* because of race, sex and national origins and based on
her undertaking protected activity under 42 U.S.C. §2000e-3 in support of other Neurosurgeons
and Neurosurgery Fellows who had filed claims and/or who had been the victims of
discrimination because of sex, race, and national origin under 42 U.S.C. §2000e *et seq.*

325.   Defendants' discrimination and retaliation against Dr. Soni in violation of 42 U.S.C.
§2000e *et seq.* interfered with her enjoyment of all benefits, privileges, terms, and conditions of
her employment with BMC and BUNA , and with her work and employment as a faculty member
at BU/BUSM, and with her medical practice as a Neurosurgeon.

326.   As a direct and proximate result of the violations of 42 U.S.C. §2000e *et seq.* as
referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her
employments and has been substantially and significantly injured in her career path that was
anticipated from her employments.

327.   As a direct and proximate result of the violations of 42 U.S.C. §2000e *et seq.* as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole as provided for under 42 U.S.C. §2000e *et seq.*

## CLAIM VI:  CONSPIRACY

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 327, as if fully stated herein.

328.   Dr. Soni had contractual rights with regard to her employment with BUNA, her work as a faculty member at BU, and her medical practice as a Neurosurgeon.

329.   Defendants acted in concert to impair, interfere and discriminate with Dr. Soni's rights to make and enforce contracts based on her race and national origin as prohibited by 42 U.S.C. §1981, and to retaliate against her under said statute due to her bringing a discrimination claim against BWH and Dr. Day and in supporting claims of discrimination brought by other medical professionals against Defendants.

330.   Defendants acted in concert to retaliate against, interfere with, and discriminate against Dr. Soni's rights of employment based on her protected acts as set out in this complaint, all under 31 U.S.C. §3730(h).

331.   Defendants acted in concert to discriminate against and interfere with Dr. Soni's rights of employment due to her status, and to retaliate against her for bringing a discrimination claim against BWH and Dr. Day, and in supporting claims of discrimination brought by other medical professionals against Defendants, as prohibited under 42 U.S.C. §2000e *et seq.*

51

332.  The Defendants combined, conspired, agreed together and with each other and with others uncharged herein and others unknown to Dr. Soni, to violate her rights now and in the future, under 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq*.

333.  Defendants conspired and acted in concert as described herein in order to discriminate against and retaliate against Dr. Soni for her various actions and status and in order to obtain Dr. Day's approval of a Neurosurgery residency training program at BMC, in violation of 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. § 2000e *et seq*.

334.  Defendants conspired to accomplish an unlawful purpose, namely the wrongful and unlawful discrimination and termination of Dr. Soni's employment with improper cause against public policy, as set out in this complaint under 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq*.

335.  Defendants conspired to accomplish an unlawful purpose, namely the wrongful and unlawful impairment of and discrimination against Dr. Soni based on her sex, race, and national origin, as set out in this complaint under 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq*.

336.  Defendants conspired to accomplish an unlawful purpose, namely by retaliating and discriminating against Dr. Soni for her lawful and protected conduct and status, under 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq*.

337.  Each and every Defendant is liable in tort because each Defendant knew that the conduct of other parties constituted a breach of duty and gave substantial assistance or encouragement to those other parties in carrying out their unlawful activities against Dr. Soni.

52

338. Each Defendant engaged in concerted activity with other Defendants, and each Defendant's deliberate conduct caused other Defendants to engage in tortious activity against Dr. Soni.

339. Defendants' conspiracy was carried out against Dr. Soni and interfered with her enjoyment of all benefits, privileges, terms, and conditions of her employment, and with her work as a faculty member at BU, and with her medical practice and staff privileges as a Neurosurgeon at BMC and BUNA.

340. In furtherance of and to effect the object of this conspiracy, Defendants committed the acts set out in paragraphs 1 through 327, as if fully set out herein.

341. As a direct and proximate result of the conspiracy as referenced and cited herein, Dr. Soni has lost all of the benefits and privileges of her employments and contracts and has been substantially and significantly injured in her career path that was anticipated from her employments.

342. As a direct and proximate result of the conspiracy as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, Dr. Soni is entitled to all relief necessary to make her whole.

### CLAIM VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff Dr. Soni re-asserts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 342, as if fully stated herein.

343. Defendants acted in concert to terminate Dr. Soni's employment and to interfere with her contractual rights as an employee of BUNA, as a faculty member at BU, and as an

attending Neurosurgeon at BMC.

344. Defendants intended to inflict emotional distress on Dr. Soni or knew or should have known that emotional distress was the likely result of their illicit conduct.

345. Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

346. Dr. Soni did suffer emotional distress and experienced stress, anxiety, and mental health issues.

347. Dr. Soni did suffer emotional distress and experienced physical illnesses.

348. Defendants' actions were the cause of Dr. Soni's emotional distress.

349. Dr. Soni's emotional distress was severe and of such a nature that no reasonable person could be expected to endure it.

350. Defendants' extreme and outrageous conduct sought to punish Dr. Soni and interfere with her current employment, prospective and future employment, and her medical career and ability to treat patients in need of her professional services.

351. Defendants' extreme and outrageous conduct sought to interfere with Dr. Soni's medical career and ability to treat patients in need of her professional services after she had spent four years in undergraduate school, four years in medical school, and eight years of post-graduate training in Neurosurgery in preparation for her career in medicine.

## GENERAL CAUSATION AND DAMAGES

352.   As a direct and proximate result of the foregoing claims, Plaintiff Dr. Soni has suffered and continues to suffer irreparable injuries relating to losses of income, property, and wealth; injury to professional standing; injury to character and reputation; and injury to physical and emotional health and general well-being.

353.   As a direct and proximate result of the foregoing claims, Plaintiff Dr. Soni was forced to leave her employment at BMC, was deprived from performing her duties as an Assistant Professor of the BUSM, and was deprived of the opportunity to render medical services as a Neurosurgeon.

354.   As a direct and proximate result of the foregoing claims, Plaintiff Dr. Soni has suffered damages as stated herein and to be proven at trial, and in an amount to be proven at trial, plus an appropriate amount for her emotional pain and suffering, and punitive damages to be determined.

355.   As a direct and proximate result of the foregoing claims, Defendants have diminished and deprived and continue to diminish and deprive Plaintiff Dr. Soni of the benefits and privileges of their contractual relationship, and of achieving a livelihood and professional status as a Doctor of Medicine and Neurosurgery in the community and elsewhere, and the status of her Assistant Professorship, and her ability to progress in the field of Neurosurgery to the degree her talents would otherwise permit.

## DEMAND FOR JURY TRIAL AND PRAYER FOR RELIEF

Plaintiff Dr. Soni respectfully demands a jury trial and prays for judgment against each Defendant named herein, as follows:

a. Declaring that the acts and practices complained of herein are in violation of the whistle-blower protections contained in 31 U.S.C. §3730(h);

b. Enjoining and permanently restraining the violations of the whistle-blower and anti-retaliation protections contained in 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq.*

c. Directing Defendants to place Plaintiff Dr. Soni in the same position that she would have held but for Defendants' discriminatory and retaliatory treatment of her – and to make Plaintiff Dr. Soni whole for all earnings and benefits she would have received but for Defendants' discriminatory and retaliatory treatment, including but not limited to wages (including front and back pay) and benefits and any and all other relief afforded under the protections contained in 31 U.S.C. §3730(h), 42 U.S.C. §1981, and 42 U.S.C. §2000e *et seq.*

d. Directing Defendants to pay Plaintiff Dr. Soni general compensatory damages in an amount to be proven at trial;

e. Directing Defendants to pay Plaintiff Dr. Soni special compensatory damages, including but not limited to actual and anticipated wage loss in an amount to be proven at trial;

f. Directing Defendants to pay the cost of this action together with costs and all reasonable attorneys' fees which arose and were incurred as the results of Defendants' violations;

g.  Declaring Defendant's acts against Plaintiff Dr. Soni as willful, wanton, and malicious, and directing Defendants to pay Plaintiff Dr. Soni punitive damages in an amount to be proven at trial; and

h.  Granting such other and further legal and equitable relief as this Court deems proper.

RESPECTFULLY SUBMITTED:

Date:  December 8, 2008          LAW OFFICES OF ELISE A. BRASSIL

_____ /s/ Elise A. Brassil _____
Elise A. Brassil, Esquire
300 Brickstone Square, Suite 201
Andover, Massachusetts  01810
Phone: (978) 662-5116
FAX: (978) 809-3043

57